**Joseph H. NORTON, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 07–94–0258–CR.

Court of Appeals of Texas, Amarillo.

May 9, 1996.

Discretionary Review Refused Aug. 28, 1996.

David M. Green, Dumas, for appellant.

Barry E. Blackwell, District Attorney, Dumas, for appellee.

Before DODSON, BOYD and QUINN, JJ.

BOYD, Justice.

In three points of asserted error, appellant Joseph H. Norton challenges his conviction of capital murder and the ensuing jury-assessed sentence of life imprisonment in the Institutional Division of the Texas Department of Criminal Justice. Appellant contends the trial court erred by 1) overruling his objection to certain statements made by the prosecutor during the voir dire examination of the jury panel, 2) not allowing his expert to inspect and conduct tests of the blood samples taken from his clothing, and 3) denying defense counsel's request for the appointment of an independent psychiatrist to examine him on the issue of insanity.

Disagreeing with those arguments, we affirm the judgment of the trial court.

On June 16, 1993, Bobby Steve Booth was employed as a trooper with the Texas Department of Public Safety in Sherman County, Texas. According to the radio log for that day, he stopped a vehicle at 3:00 p.m. near a roadside park north of Stratford on Highway 287. The events that occurred subsequent to that stop were witnessed by people as they drove by the place where Officer Booth's patrol vehicle and appellant's gray GMC vehicle were parked.

Officer Booth and appellant were first seen between the rear end of the pickup and the front of the patrol vehicle, apparently engaged in a routine traffic stop. Both men then proceeded to the front of the patrol vehicle. The next event witnessed by passersby was a scuffle between Booth and appellant taking place at the rear of the patrol car. Pat Boren testified that as she was driving to Kerrick, a small town north of Stratford, she saw the two men "standing chest to chest, fighting." When she "saw the patrolman definitely getting the bad end of the thing," she turned her car around so she could go for help. At this point, she "saw the black man standing there with a gun in his hand and the trooper was out in the edge of the wheat field." She said that Booth was running away from appellant, turned and held his hands in front of his face, and was shot by appellant while in that posture.

The next witness presented by the State averred she saw appellant running from the wheat field and getting into a gray pickup. The first law enforcement officer on the scene found Booth lying at the edge of the field. He found no pulse. An autopsy later revealed Booth had been shot five times at close range.

In his first point of error, appellant specifically contends that certain statements made by the prosecutor during the jury panel voir dire were "improper, injurious, prejudicial, and contained misstatements [sic] of the law which prevented appellant from receiving a fair trial."

In considering that challenge, our first task is to determine whether the alleged error might possibly have prejudiced the jurors. *Harris v. State*, 790 S.W.2d 568, 587–88 (Tex.Crim.App.1989). To do so, we must examine the source of the alleged error, whether or to what extent it was emphasized by the State, its probable collateral implications, how much weight a juror would place upon the error, and whether declaring the error harmless would encourage the State to repeat it with impunity.[1] *Id.* at 587. Statements made by counsel generally will not constitute reversible error unless, in light of the record as a whole, the statements are "extreme or manifestly improper, violative of a mandatory statute, or inject new facts harmful to the accused into the proceedings." *Godfrey v. State*, 859 S.W.2d 583, 585 (Tex. App.—Houston [14th Dist.] 1993, no writ), citing *Brooks v. State*, 642 S.W.2d 791, 798 (Tex.Crim.App.1982). Therefore, we must first determine if the statements were improper, and, if so, whether they were harmless.

In making such determinations, we must bear in mind that great latitude should be allowed in voir dire examinations so that counsel for both the State and the defense have a good and sufficient opportunity to assess the relative desirability of the members of the venire. *White v. State*, 910 S.W.2d 630, 634 (Tex.App.—Beaumont 1995, no pet.), citing *Battie v. State*, 551 S.W.2d 401, 404 (Tex.Crim.App.1977), *cert. denied*, 434 U.S. 1041, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978); *Orosco v. State*, 827 S.W.2d 575, 577 (Tex.App.—Fort Worth 1992, pet. ref'd). The trial court has discretion to determine the propriety of any question or comment, and appellate review of the trial court's decision is limited to ascertaining whether the

---

1. Texas Rule of Appellate Procedure 81(b)(2) provides generally that if error is revealed in the record of a criminal case, it must be reversed unless the appellate court determines beyond a reasonable doubt the error made no contribution to the conviction or the punishment. However, in *Orona v. State*, 791 S.W.2d 125 (Tex.Crim.App. 1990), the court held this rule does not apply to jury argument error. We assume the same rule would be applicable to opening statements as no evidence is being presented in either stage of the trial and the situations are basically similar.

court abused its discretion. *White,* 910 S.W.2d at 634.

The statements about which appellant complains are that Booth was a husband and father, and that he was "maliciously and systematically executed." Appellant also complains that the prosecutor said that "it's the duty of the State of Texas to see that the person that committed that act is brought to trial and convicted of this offense." Citing Tex.Code Crim.Proc.Ann. art. 2.01,[2] appellant argues this was a reversibly erroneous statement of the prosecutor's duty.

Appellant's trial objection was that he was objecting to any references to Booth being a husband or father because "[t]hat's not a fact alleged in the indictment." He further objected to the prosecutor's reference to Booth being "maliciously and systematically executed" by saying "I'm going to object to any references of maliciousness, malicious conduct on my client's behalf. That's not the legal standard in this case. And I would like a running objection on that." After the overruling of these objections, the following colloquy occurred:

> MR. GREEN (Defense Counsel): I'm going to object to the use of any fact that would suggest an execution. The indictment says, "by shooting." There are no words in the indictment that talk about "the execution." I'm going to object to any references by the prosecutor—
>
> THE COURT: I'll overrule that objection.
>
> MR. BLACKWELL (Prosecutor): Your Honor, am I going to have to come up every single word in this particular opening or—
>
> THE COURT: I think that's up to Mr.— Mr. Green.
>
> MR. BLACKWELL: That the evidence will show that Officer Booth was shot and left to die at a road north of Stratford in Sherman County, Texas. Now, it's the duty of the State of Texas to see that the person that committed that act is brought to trial and convicted of this offense. And we accept that being an obligation—

> MR. GREEN: Excuse me. I need to make an objection, please. If we can approach the bench?
>
> THE COURT: You may approach.
>
> MR. GREEN: Your Honor, Mr. Blackwell is misstating the law. It is not the State's duty to seek a conviction. It is Mr. Blackwell's duty as an elected prosecutor to seek justice, not convictions. That's the oath that he takes, and I would like an objection to that reference by Mr. Blackwell before the entire panel.

  \*   \*   \*   \*   \*   \*

■ An error presented on appeal must be the same as the objection made at trial. *Vanderbilt v. State,* 629 S.W.2d 709, 721 (Tex.Crim.App.1981). Appellant's trial objections to references that Booth was a husband or father and to any "execution" based on neither reference being alleged in the indictment vary from his contentions on appeal and are, accordingly, waived.

■ The remaining objections are to references by the prosecutor to "maliciousness, or malicious conduct" on the part of appellant as not being the legal standard in this case, and to the prosecutor's reference to the State's duty. Assuming arguendo that these statements were not proper, they would not require reversal.

■ It is the rule that an erroneous jury argument does not require reversal unless it is "manifestly improper, harmful and prejudicial when considered with the record as a whole." *Burke v. State,* 652 S.W.2d 788, 790 (Tex.Crim.App.1983). A similar error occurring during an opening statement should be governed by the same rule.

We do not find the prosecutor's statements challenged here to be manifestly improper when measured by the record *en toto.* The statements were made in the opening statement, a time far removed from the charge stage, and at a time when it was evident to the panel that both sides were merely discussing what they expect the evidence will show at trial. The State did not emphasize

---

**2.** The relevant portion of this article is "It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done." Tex.Code Crim. Proc.Ann. art. 2.01 (Vernon Supp.1996).

its description of the occurrence as a malicious execution but, indeed, attempted to recant and modify its description by stating the evidence would show the officer "was shot and left to die at a road north of Stratford."

Additionally, prejudicial collateral implications from the State's passing reference were unlikely as jurors are unlikely to place much weight upon that type of comment in the beginning stages of trial. At the charge stage, the trial court repeatedly defined and described the legal standard for finding guilt as "intentionally and knowingly" causing death. We must presume the jury followed that instruction and nothing in the record indicates otherwise.

With regard to the prosecutor's statement concerning the State's "duty," it was also not of such a character as to have collateral implications. Later, after hearing the actual evidence, the trial judge carefully charged the jury as to their duty and such matters as the burden of proof, reasonable doubt and the presumption of innocence. Appellant does not point us to any place in the record where the State emphasized or reiterated to the jury in any way that their duty was to convict. Again, we find it unlikely any juror would place much weight upon this type of comment or error and we do not think that declaring this error, if it was an error, harmless, would encourage the State to commit similar errors.

In sum, we find the statements challenged were of a passing nature and were not so injurious as to require reversal. Given our standard of review, these statements were not extreme or manifestly improper, violative of a mandatory statute, nor did they inject new facts harmful to the accused into the trial. They certainly were not of a nature as to make it impossible for the jury to properly apply the law to the facts in reaching its verdict. *See Harris v. State,* 790 S.W.2d 568, 587–88 (Tex.Crim.App.1989). Appellant's first point of error is overruled.

■■■ In his second point, appellant argues the trial court erred in not allowing his expert to "inspect and conduct tests of the blood samples taken from appellant's clothing, on which testimony was offered by the State's DNA expert, Dr. David H. Bing, purporting to be the victim's DNA blood type." To support his contention, appellant primarily relies upon the decision in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), a case in which the defendant requested the appointment of a psychiatrist to assist on the issue of the defendant's sanity at the time of the offense. In considering the defendant's request, the *Ake* Court explained that due process requires access to raw materials integral to the building of an effective defense. It went on to say that while a State need not "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy," it must provide him the basic tools to present his defense within our adversary system. *Id.* at 77, 105 S.Ct. at 1093.

The *Ake* Court then set forth three factors as relevant considerations in determining "whether, and under what conditions, the participation of a psychiatrist is important enough to preparation of a defense to require the State to provide an indigent defendant with access to competent psychiatric assistance in preparing his defense." *Id.; Rey v. State,* 897 S.W.2d 333, 337 (Tex.Crim.App. 1995). Of those three factors, the first is the private interest that would be affected by the action of the State. The second is the governmental interest that will be affected if the safeguard is to be provided. The third is the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided. *Ake,* 470 U.S. at 77, 105 S.Ct. at 1093; *Rey,* 897 S.W.2d at 337.

The *Ake* Court placed its greatest emphasis on the third factor, emphasizing the importance of psychiatric testimony in conveying to the factfinder an understanding of the defendant's mental state and its potential impact on his behavior at the time in question. In a case like the one it was considering, the Court concluded the risk of an improper verdict was high where the defendant was not assisted by a psychiatrist to "help determine whether the insanity defense is viable, to present testimony, and to assist in preparing the cross-examination of a State's psychiatric witnesses." *Ake,* 470 U.S. at 82,

105 S.Ct. at 1096. With the predicate statement that where it is clear the defendant's sanity is likely to be a significant factor, "a defense may be devastated by the absence of a psychiatric examination and testimony; with such assistance, the defendant might have a reasonable chance of success," the Court went on to hold that

> ... when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Id.* at 83, 105 S.Ct. at 1096.

■ Although earlier Texas cases stated in dicta that *Ake* would be limited to insanity cases, subsequent federal and state cases have expressly overruled this contention. *See Rey v. State,* 897 S.W.2d at 338 n. 4 (citing many such federal and state cases). It now seems to be established that if an indigent defendant has established a substantial need for an expert, without which the fundamental fairness of his trial will be called into question, *Ake* requires the appointment of an expert regardless of his field of expertise. *Rey,* 897 S.W.2d at 338.

Relying on *McBride v. State,* 838 S.W.2d 248 (Tex.Crim.App.1992), appellant argues that because the State offered evidence and testimony on DNA testing through their expert, he had a right to inspect and test the evidence which is material to his defense and indispensable to the State's case. In the *McBride* case, the court did indeed hold that a defendant was entitled to inspect evidence indispensable to the State's case because such evidence is necessarily material to the defense of the accused. *Id.* at 251. However, the *McBride* court, citing *Lake v. State,* 577 S.W.2d 245, 246 (Tex.Crim.App.1979), noted that the right of inspection may be a qualified right when the evidence has been destroyed in the process of analysis. *McBride v. State,* 838 S.W.2d at 251, n. 6.

Although he denied appellant's request that Dr. Robert C. Giles conduct his own testing of the blood, hair, and other tissue samples tested by the State's expert witness, the trial judge appointed Dr. Giles to assist and consult with appellant's counsel "to interpret blood testing results and genetic testing results done on blood, hair, and body tissues done by the State's expert."

Review of the record reveals that the potential blood samples taken from appellant's clothing were very small. Although experts who performed tests on behalf of the State testified there were strands of DNA left on the clothing, there was also testimony that the tests that had been performed could not be performed again because there were not enough samples to allow identical testing by both the State and the defense. Other items had been destroyed in the testing.

Additionally, although appellant argues the DNA evidence by the State "was a major part of the State's indispensable burden to identify Appellant as the person who committed the crime," we disagree. Officer Booth was killed beside a somewhat busy highway in the middle of the afternoon on a summer day. Three witnesses placed appellant at the scene. One of the witnesses actually saw appellant and the officer struggle, the officer try to flee, and appellant shoot the officer. Other witnesses placed appellant at the railroad site where Booth's pistol was found as well as in the gray pickup which had been seen at the shooting site. In light of this other evidence, results of the DNA tests were merely cumulative. The trial court's refusal to permit testing does not require reversal. *McBride v. State, supra;* Tex. R.App.P. 81(b)(2).

■ Moreover, we do not believe that appellant made a sufficient preliminary showing that the issue upon which he based his application for appointment of an expert to test and evaluate materials was likely to be a significant factor at trial. The government is not required to automatically provide indigent defendants with expert assistance to perform tests or to provide consultation. *Davis v. State,* 905 S.W.2d 655, 659 (Tex. App.—Texarkana 1995, pet. ref'd), *citing Yohey v. Collins,* 985 F.2d 222, 227 (5th Cir. 1993). Such an appointment is only required in cases where a defendant has made a sufficient threshold showing that not only does

there exist a reasonable probability that an expert would be of assistance, but also that denial of expert assistance would result in a fundamentally unfair trial. *Davis*, 905 S.W.2d at 659, *citing Moore v. Kemp*, 809 F.2d 702, 712 (11th Cir.), *cert. denied*, 481 U.S. 1054, 107 S.Ct. 2192, 95 L.Ed.2d 847 (1987). If, however, the defendant makes such a sufficient threshold showing, a trial court's denial of the motion amounts to structural error affecting the underpinnings of the entire trial, which cannot be evaluated for harm and requires automatic reversal. *Davis*, 905 S.W.2d at 659, *citing Rey*, 897 S.W.2d at 345–46.

The State argues that appellant never made the required threshold showing of need. In particular, the State contends appellant failed to support his motion "with affidavits or any other showing as to what his defensive theory was and why expert assistance would be helpful in establishing that theory, or a showing that there was a reason to question the State's expert." Typically, in the cases in which a defendant's motion was correctly denied, it was because it was not supported by evidence of the type mentioned by the State. Whereas, in cases holding the defendant was entitled to the appointment of an expert, or, as we are discussing here, entitled to the testing of certain materials and evidence, the defendant generally made his defensive theory clear to the trial court and supported it with factual allegations and/or evidence as to why and how expert testimony or testing would aid in the proper presentation of his defensive theory. *Rey*, 897 S.W.2d at 341.

In this case, although Dr. Giles had been appointed to aid appellant in evaluating the State's blood and other tests, there was no evidence in the form of affidavits or other sworn testimony about the capabilities of independent testing or how it would aid any defensive theory advanced by appellant or the potential results that could be obtained from such testing. *See Davis*, 905 S.W.2d at 660. In sum, appellant did not make a suffi-

cient threshold showing that the requested tests were essential to the development of a defensive theory. Appellant's second point is overruled.

■■■ In his third point, appellant contends the trial court erred in denying his request for the appointment of "an independent psychiatrist on the issue of sanity where the court had already determined that sanity might be a significant factor by ordering the court's own examination by a court appointed psychiatrist." Appellant filed a notice of intention to raise an insanity defense and on January 27, 1994, filed a motion stating that to adequately prepare for trial and possible sentencing, he "require[d] the services of independent expert witnesses in the areas of psychiatry, psychology...." In the motion he also objected to filing the motion "publicly" because if he was not indigent and had the funds to employ expert witnesses, "the State would have no knowledge of these expert witnesses until the actual time of trial," and filing the motion publicly "deprives the Defendant significantly of what would otherwise be his right to prepare his case without divulging the same to the State." He also requested "that the Court assist the defense in keeping the names of these experts confidential." On March 10, 1994, the trial court granted the motion to the extent that the "Court will allow Defendant Expert Assistance [sic] as requested and that such experts are covered by the attorney-client privilege. Court denies the request to maintain the confidentiality of said experts." However, no expert was actually appointed at that time.

On April 19, 1994, appellant filed "Defendant's Motion For Ex Parte Hearing" in which, citing the *Ake* case, he requested "an ex parte hearing to make a threshold showing to the trial court that his sanity and future dangerousness are likely to be significant factors at trial." He also filed a motion seeking to have the trial court declare Tex. Code Crim.Proc.Ann. art. 46.03 [3] unconstitu-

---

3. The relevant portions of that article are:
   If notice of intention to raise the insanity defense is filed under Section 2 of this article, the court may, on its own motion or motion by the defendant, his counsel, or the prosecuting at-

torney, appoint disinterested experts experienced and qualified in mental health and mental retardation to examine the defendant with regard to the insanity defense and to testify thereto at any trial or hearing on this issue.

tional. In the motion, appellant argued the article was unconstitutional because it required an indigent defendant to file as a public record his motion seeking appointment of a neutral court psychiatrist and required the report to be furnished to the court and prosecuting attorney as well as the defense attorney. He argued in his motion, at the trial court hearing on the motion, and in his appellate brief that the statute has the effect of forcing a defendant to give testimony against himself because any information learned by the court-appointed neutral expert is divulged to the prosecutor and the court and is not protected by the attorney-client privilege. He contends that if an indigent defendant is required to give up his right against self-incrimination in order to obtain an examination of himself on the issue of insanity, effective assistance of counsel has been denied. He also posits that the failure to appoint a psychiatric expert "covered by the attorney/client privilege to assist the defendant in whatever he may encounter from the examination conducted by the court's neutral expert" denied appellant the effective assistance of counsel and due process of law.

At the hearing, appellant's attorney testified that in his initial and recent conversations with appellant, appellant said he had no recollection of any contact with a state trooper, nor did he remember any traffic stop north of Stratford or anything that happened that day. Appellant also told his attorney that when he was twelve or thirteen years old, he was hit in the head with a railroad tie and knocked unconscious. He also related a story of receiving a "rather severe electrical shock which knocked him unconscious and required some ... medical treatment." Since that time, he claimed to have had blackout spells, periods of time about which he cannot remember his actions, as well as a tendency to fall asleep and regain consciousness in the middle of activities.

Appellant's attorney argued that this behavior was consistent with the facts of this case in which, even after being seen with the

slain trooper, appellant went back to Stratford and wandered around looking for the bus station. It is, of course, appellant's position that the attorney's testimony at the hearing, without more, when coupled with the State's pursuit of the death penalty in the case, was sufficient to meet the threshold requirement of *Ake* and its progeny and thus entitle him to the appointment of a partisan psychiatrist.

The trial court refused to declare article 46.03 unconstitutional, and on May 11, 1994, entered an order finding that a psychiatric examination described in article 46.03 should be conducted. Accordingly, arrangements were made for appellant to see Dr. R. Preston Shaw in Lubbock, with directions to the doctor to give appellant his "Miranda" rights prior to the examination. Specifically, the trial court ordered that Dr. Shaw determine appellant's present sanity and his sanity on the day of the shooting, and limited his examination in that he

> ... make no examination to determine or render any opinion as to whether or not there is a probability that Defendant, JOSEPH H. NORTON, would commit criminal acts of violence that would constitute a continuing threat to society, as the only examination that is ordered is set forth above.

The doctor was then directed to send written reports containing the result of his examination to the trial judge, the prosecutor, and defense counsel.

Dr. Shaw never conducted a psychiatric examination because on May 18, 1994, appellant filed a "Motion to Withdraw Notice of Insanity Defense" in which he stated that he had

> [a]dvised Defendant to invoke his 5th and 6th amendment rights under the United States Constitution and his rights under the Texas Constitution not to be examined or answer questions from the Court's appointed psychiatrist and Defendant concurs with counsel's advise [sic] and hereby

Tex.Code Crim.Proc.Ann. art. 46.03(3)(a) (Vernon Supp.1996).
> When a defendant wishes to be examined by psychiatrist or other expert of his own choice, the court on timely request shall provide the

examiner with reasonable opportunity to examine the defendant.
Tex.Code Crim.Proc.Ann. art. 46.03(3)(f) (Vernon 1979).

invokes these rights, and requests the Court to cancel the examination.

■ If a defendant requests a psychiatric evaluation or presents psychiatric evidence, he has no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution. *Buchanan v. Kentucky*, 483 U.S. 402, 422, 107 S.Ct. 2906, 97 L.Ed.2d 336 (1987). A defendant's silence would deprive the prosecution of the only effective means it has of controverting the defendant's proof on an issue he has interjected into the case. *Estelle v. Smith*, 451 U.S. 454, 465, 101 S.Ct. 1866, 1874, 68 L.Ed.2d 359 (1981). However, the law requires that before any such psychiatric interview, a defendant's Fifth Amendment rights should be protected by warnings intended to serve as "procedural safeguards effective to secure the privilege against self-incrimination." *Hernandez v. State*, 805 S.W.2d 409, 411 (Tex.Crim.App. 1990), *cert. denied*, 500 U.S. 960, 111 S.Ct. 2275, 114 L.Ed.2d 726 (1991), *citing Estelle v. Smith*, 451 U.S. at 466, 101 S.Ct. at 1874, quoting *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966). The Fifth Amendment is not violated when the State uses testimony from such an evaluation in response to a defendant's introduction of psychiatric evidence supporting his incompetency or insanity plea. *Hernandez*, 805 S.W.2d at 412.

■ In *Estelle v. Smith*, the trial court sua sponte ordered a psychiatric evaluation for the "limited, neutral purpose of determining his competency to stand trial," but at trial, the psychiatrist testified as to the defendant's future dangerousness based on statements the defendant made and omitted in reciting the details of the crime. 451 U.S. at 464, 101 S.Ct. at 1874. The court held there is no distinction between the guilt and penalty phase of a defendant's capital murder trial "so far as the protection of the Fifth Amendment privilege is concerned." *Id.* at 462–63, 101 S.Ct. at 1873. Because of the gravity of the decision made at the penalty phase, the prosecution must observe fundamental constitutional guarantees and any effort by the prosecution to compel respondent to testify against his will at the punishment hearing clearly contravenes the Fifth Amendment.

The state trial judge, sua sponte, ordered a psychiatric evaluation of respondent for the limited, neutral purpose of determining his competency to stand trial, but the results of that inquiry were used by the State for a much broader objective that was plainly adverse to respondent. Consequently, the interview with Dr. Grigson cannot be characterized as a routine competency examination restricted to ensuring that respondent understood the charges against him and was incapable of assisting in his defense. Indeed, if the application of Dr. Grigson's findings had been confined to serving that function, no Fifth Amendment issue would have arisen. *Estelle v. Smith*, 451 U.S. at 465, 101 S.Ct. at 1874.

We find this rationale applicable in the instant case. The trial judge's order was properly limited to determining whether appellant was presently sane or sane at the time of the alleged offense, and disallowed any examination or testimony regarding future dangerousness.

■ Instead of submitting to the properly ordered examination by the court-appointed psychiatrist and thereby attempting to make a threshold showing, appellant withdrew his plea of insanity, thereby waiving any error that may have resulted from the trial court's failure to appoint a partisan expert. It is well established that even constitutional rights can be waived by conscious decisions of trial strategy. *Zerschausky v. Beto*, 396 F.2d 356, 358 (5th Cir.1968), *citing Henry v. State of Mississippi*, 379 U.S. 443, 450–51, 85 S.Ct. 564, 569, 13 L.Ed.2d 408 (1965). For example, our Court of Criminal Appeals has held that constitutional rights such as the right of confrontation can be knowingly and voluntarily waived as a matter of trial strategy. *Burks v. State*, 693 S.W.2d 747, 750 (Tex.App.—Houston [14th Dist.] 1985, pet. ref'd), citing *McMahon v. State*, 582 S.W.2d 786 (Tex.Crim.App.1978).

In this case and under this record, the withdrawal of appellant's insanity plea waived any error that may have occurred as a result of the trial court's failure to appoint

an independent expert to aid in the preparation of an insanity defense. *U.S. v. Williams,* 998 F.2d 258, 264 (5th Cir.1993), *cert. denied,* 510 U.S. 1099, 114 S.Ct. 940, 127 L.Ed.2d 230 (1994). Appellant was represented by counsel whose competence is demonstrated by this record, and who expressly acknowledged in the motion to withdraw an insanity defense that he had advised his client to invoke his Fifth and Sixth Amendment rights, and that appellant "concur[red]" with such advice. This is sufficient to show a knowing and voluntary waiver of known rights, *i.e.,* the right to assert an insanity plea. We are well aware of the difficulty faced by trial counsel in making decisions involving trial strategy; however, the ability to make such "Hobson's Choices" and the knowledge that such choices must be made in the course of a trial is part of the responsibility of any lawyer in the trial process. This record does not reveal that in doing so, counsel failed to render the effective assistance of counsel which is the hallmark by which performance of trial counsel is gauged.

Moreover, even assuming arguendo that the question was preserved for appellate review, appellant has not made the required threshold showing that his sanity was likely to be a significant factor at trial. It is only when such a showing is made that a trial court abuses its discretion by failing to appoint or give prior approval to reasonable expenses incurred to obtain the necessary expert to assist in the evaluation, preparation and presentation of an insanity defense. *De Freece v. State,* 848 S.W.2d 150, 159 (Tex. Crim.App.1993). Unfortunately, neither *Ake* or *De Freece* articulated a clear standard by which to determine if a defendant has made a sufficient threshold demonstration that his sanity will be a significant factor in the case. We do notice that in *De Freece,* along with a passing comment that they were not saying article 46.02 § 3(a) is unconstitutional, the court noted that a preliminary examination conducted in the manner prescribed and by "disinterested experts" may show that insanity will not be a significant factor in the case, in which event the due process rights articulated in *Ake* will not be triggered. *De Freece,* 848 S.W.2d at 159. The court implicitly, if not directly, recognized that the procedure prescribed by article 46.02 § 3(a) aids a trial court in determining when the insanity question is sufficiently serious to trigger the appointment of a partisan expert to help the defendant and aid in the proper exploration and presentation of the sanity issue at trial.

In *Williams v. Collins,* 989 F.2d 841 (5th Cir.1993), in an attempt to formulate a test to aid in its decision whether that appellant had made a threshold showing to require appointment of partisan expert assistance, the court sought guidance from the previous Fifth Circuit cases of *Volanty v. Lynaugh,* 874 F.2d 243, 245 (5th Cir.), *cert. denied,* 493 U.S. 955, 110 S.Ct. 369, 107 L.Ed.2d 355 (1989) and *Volson v. Blackburn,* 794 F.2d 173 (5th Cir. 1986). In its discussion, the *Williams* court determined that "neither the bare assertion that the defendant was insane at the time of the offense, nor evidence of mental problems generally is sufficient to make the threshold showing required by *Ake.*" 989 F.2d at 845. The court went on to hold that a defendant only satisfies the necessary threshold showing when he has buttressed his assertions with a factual showing sufficient to give the trial court reasonable ground to doubt his sanity. *Id.*

Texas courts have adhered to a similar standard. In *Day v. State,* 704 S.W.2d 438 (Tex.App.—Amarillo 1986, no pet.), a pre–*De Freece* case, this court attempted to follow "the meager guidance" given by the *Ake* Court and held that a defendant must make a preliminary showing that the question of his sanity is "one with merit undergirded with evidentiary support." *Id.* at 440. Bearing that test in mind, and considering a disinterested psychiatrist's finding that the appellant was competent to be tried and sane at the time of the offense, as well as the appellant's failure to produce any testimony or evidence of his mental problems or bizarre behavior prior to the incident, we held the trial court's appointment of the disinterested psychiatrist to make the initial examination was sufficient to satisfy the requirements of the *Ake* case. *Id.* at 440–41.

In *Knight v. State,* 868 S.W.2d 21 (Tex. App.—Houston [1st Dist.] 1993, pet. ref'd), a case decided after *De Freece,* an evaluating

psychologist determined the appellant to be sane at the time of the offense and competent to stand trial. As relevant, that appeal, like unto this one, involved the question of whether the trial court erred in refusing to allow the appellant an examination by a private psychiatrist. En route to its decision, the court examined the holdings in both *Ake* and *De Freece* and noted that in both cases "the surrounding circumstances and psychiatric evaluations of the defendants were such as to indicate that their sanity would be a significant factor at trial." *Knight,* 868 S.W.2d at 23. In both *Ake* and *De Freece,* the trial court refused to allow the defendants expert assistance, even though the trial court had before it psychiatric evaluations that the defendants had mental problems.

In the case before it, the *Knight* court noted that the appellant's motion for the appointment of a psychiatric expert was based on counsel's belief that "appellant 'is afflicted with some sort of mental disorder,' his inability to reach a judgment as to the appellant's sanity, and advice given to him by members of appellant's family that appellant has had 'symptoms of severe mental disorder of [sic] mental defect.'" It also noted that a disinterested expert had been appointed and as a result of his examination, had concluded that appellant was sane. Commenting that the beliefs or speculation of an appellant's attorney do not meet the type of showing required by *Ake* and *De Freece* and that a mere request for psychiatric examination is not probative of incompetence, the court held that under the evidence before it, the trial court did not reversibly err in refusing the application. *Knight,* 868 S.W.2d at 24. Parenthetically, the *Knight* court did indicate that "uncooperative" and bizarre behavior of the type considered by the court in *Burks v.*

*State,* 792 S.W.2d 835, 840 (Tex.App.—Houston [1st Dist.] 1990, pet. ref'd) might be "arguably indicative" of incompetence, but no such behavior had been shown. *Id.*

The lesson to be gleaned from these authorities is that there is no bright line test by which to measure whether an appellant has met his threshold burden. Rather, that decision must be made on a case-by-case basis; however, the authorities are consistent that the appellant must show more than the mere conclusions of his or her attorney. In this case, those conclusions were not supported by evidence of any nature, such as testimony by family members of bizarre behavior, instances demonstrating probable mental aberration, or any other evidence of like kind sufficient to undergird the attorney's conclusions. Indeed, though there may be instances where other types of evidence are so strong that it may not be necessary, our perusal of the cases reveals that a preliminary examination by the statutory expert as provided by the statute is nearly always necessary. In any event, under this record, appellant did not make the prerequisite showing that the question of his sanity is "one with merit undergirded with evidentiary support," the test referred to in our *Day* opinion.[4] Appellant's third point is overruled.

In summary, for the reasons we have expressed above, all of appellant's points of error are overruled and the judgment of the trial court affirmed.

---

4. We do note that during jury voir dire on June 13, 1994, defense counsel presented an "Ex Parte Motion for Further Examination of Defendant on the Issues of Future Dangerousness and Mitigating Circumstances," again requesting that any results generated by any examination be subject to the attorney-client privilege. Attached to the motion was an affidavit by Dr. William Bruce Jones, a licensed psychologist who specializes in neuropsychology and neuropsychological evaluations. Dr. Jones averred that the testing he was able to perform with appellant indicated brain dysfunction, cortical injury and a need for further assessment, then requested 1) basic and quantitative electrocephalogram and thorough neurological evaluation, 2) magnetic resource imaging and/or photon emission scanning, 3) rheumatological evaluation by rheumatologist, 4) toxicology evaluation by toxicologist and 5) psychiatric evaluation by a psychiatrist. However, Dr. Jones did not express any opinion as to appellant's insanity or inability to stand trial. This motion and affidavit were presented after appellant withdrew and thereby waived his insanity defense.